HON. ALANSON H. BARNES, ⎫
HON. GIDEON C. MOODY, ⎬ ASSOCIATE JUSTICES.
HON. JEFFERSON P. KIDDER, ⎭

## UNITED STATES V. ADAMS.

1. **UNITED STATES CAUSES: CHANGE OF JUDGES: CODE CRIMINAL PROCEDURE NOT APPLICABLE.** The provisions of the Code of Criminal Procedure relating to change of Judge upon an affidavit of prejudice, do not apply to a case where the Court is sitting as, and exercising the jurisdiction of a District and Circuit Court of the United States. In such a case the Court has no power to make an order changing the judge, and calling another judge to preside at the trial; and such an order if made would not be binding upon such called judge.

2. **EVIDENCE: DOCUMENTARY.** Certain documentary evidence, consisting of documents from the office of the Auditor of the Treasury for the Post Office Department: *Held*: properly admitted.

3. **EMBEZZLEMENT: DEMAND: NOT NECESSARY WHEN: INEFFECTUAL.** When demand would be ineffectual it is unnecessary to be proven to fix a criminal liability 'for embezzlement. Demand and refusal are *prima facie* evidence of embezzlement under the Statute cited in this case, but are not the only evidence of embezzlement permissible; and proof of such demand and refusal is not in all cases essential to conviction.

4. **EVIDENCE: EXCLUSION OF: OFFERED BY DEFENDANT, SHOWING GUILT: DEFENDANT CANNOT COMPLAIN.** The exclusion of evidence offered by the defendant, the only effect of which would be to prove the defendant guilty as charged, is not error of which the defendant can complain.

5. **PUBLIC OFFICER: UNLAWFUL EXPENDITURE BY: GOOD FAITH NO DEFENSE.** The unlawful expenditure by a public officer of public moneys entrusted to him as such, cannot be excused or justified by him merely because he believes that their expenditure was necessary or proper—he is bound to know the law, and cannot escape responsibility for his acts when they are unlawful, by asserting his good faith.

VOL. 2—40

6. ACT ITSELF MADE CRIMINAL: CRIMINAL INTENT CONCLUSIVELY INFERRED. A criminal intent is generally an essential ingredient in the commission of a crime, and proof of such an intent to the satisfaction of the jury is necessary to a conviction; but where, as under the sections involved in this case, the *act or omission* is of itself made to constitute the criminal offense, knowingly and willfully doing the act, or omitting to perform the duty imposed by the law, carries with it a conclusive inference of criminal intent, and no other evidence of such intent is necessary.

7. CHARGE TO JURY: MUST BE CONSIDERED WITH CONTEXT, AND IN RELATION TO CASE. To determine the correctness of an instruction we are not at liberty to select a single sentence of the charge, consider it apart from other portions of the instructions, and construe it disconnected from the case before the jury; it must be considered with the context, and in its relation to the case upon trial; in such connection and relation, *Held,* the charge complained of not error.

*Writ of error to the District Court of Lawrence County, First Judicial District.*

INDICTMENT and conviction for embezzlement of the public moneys of the United States.

*Caulfield & Carey* for plaintiff in error.

The defendant made a preliminary motion in this case, asking that another judge be called to preside at the trial, on the grounds of prejudice on the part of the presiding judge against him. The motion was denied by the court on the grounds that there was no power in the court to grant it.

The question is, does the court possess the power, and is it not a matter resting in the discretion?

It would seem that there ought to be some power in a case of this kind, otherwise a defendant may be compelled to be tried by his bitterest enemy. The Statutes of the United States do not, in terms, provide for such cases. But in the Territorial courts the mode of procedure in criminal cases under the laws of the United States, do in many particulars conform to the Territorial laws. This motion was made in conformity with these laws, and if the Territorial laws govern in some instances, why may they not in this, unless there be some Statute of the United States to the contrary? Section 918 provides: "The several Circuit and District Courts, may from time to time, and in any manner not

inconsistent with any law of the United States, or with any rule prescribed by the Supreme Court under the preceding section make rules and orders directing the return of writs and processes etc., and otherwise regulate their own practice as may be necessary or convenient for the advancement of justice and the prevention of delay in proceedings." This does not seem to be confined to civil cases, but embraces all cases, and clothes the court with ample discretion to "regulate their own practice as may be necessary or convenient for the advancement of justice." It certainly would seem that the exercise of such a discretion, under such a motion, might tend to the "advancement of justice." Such rules are only called into existence as the necessity for them becomes manifest. If no rule has been made, the power to make the rule exists, and therefore the discretion exists. This is not one of the powers enumerated in the Statutes of the United States, but in the absence of a rule made by the courts, does not the Statute of the Territory, which authorizes the court to call in another judge, on the making of such a motion, take the place of the rule? The Statute of the Territory obviates the necessity of making such a rule by the court and is, or stands for, the rule itself. If this be true it was error in the court to deny the motion on the grounds of want of power. Suppose the court has one of its personal enemies brought before it on a criminal charge, and the court conscientiously feels itself so prejudiced against the defendant that it can not and ought not to preside at his trial. Is there no power to relieve him? We think there is. We think he possesses the power to call in another judge for the "advancement of justice."

We think the court seriously erred in allowing evidence of the demand of payment of the draft made upon Adams by the Auditor, to be given as it was. The act of Congress makes the failure on the part of a postmaster to pay any draft made upon him *prima facie* evidence of embezzlement. Proof then of the demand and failure to pay, on a trial for embezzlement, should be fully and strictly made. We contend that in this case there is no legal proof whatever of a demand and refusal. The United States Attorney attempted to prove a demand and refusal by the introduction of a letter from the Auditor of the Treasury Depart-

ment at Washington, addressed to Thomas F. Hall, postmaster at Omaha, enclosing a draft for collection on Adams at Chicago, and a letter back from Hall to the Auditor in regard to his action in the premises. This was all the proof of a demand and refusal except an attempt to prove an admission by Adams, which we will notice hereafter. Section 882 of the Revised Statutes of the United States, under which this testimony was offered, does not create evidence, it simply makes copies of those things which are evidence, admissible in lieu of the originals. But the original letter from the Auditor to Hall is not in itself competent evidence of a demand. Nor is a letter from Hall back to the Auditor, giving an account of anything he had done in the premises, competent to prove a demand and refusal. Such proof is not competent at common law and it is not made so by Statute. Section 882 provides that "copies of any books, records, papers or documents in any of the executive departments, shall be admitted in evidence equally with the originals." But in this case the originals are not evidence of the demand and refusal, and consequently the copies are worthless to that end. Section 889 Revised Statutes of the United States, provides what papers are admissible in criminal cases, and letters such as these are not included. It says "copies of the quarterly returns of postmasters and of any papers pertaining to the accounts in the office of the sixth auditor, under the seal of his office, shall be admitted as evidence in civil and criminal cases. But these letters do not pertain to the *accounts* in the office of the sixth auditor. The demand and refusal of the payment of a draft on Adams, even if legally established, in no manner tends to show the state of accounts in the auditor's office. The prosecution, therefore, have utterly failed to prove any demand, and refusal of the payment of that draft. In addition to which we have the testimony of Adams that the draft was never presented, and he never saw it. The same objection maintains as to the competency of the draft offered, as there was no evidence of its presentment for payment. The prosecution, finding it had failed in its proof on this point, undertook to supply it by attempting to prove an admission on the part of Adams of a demand upon him for payment of the draft. But what is the admission? It is simply that he would

not deny what the Auditor had done in the attempt at making a demand. He did not admit the sufficiency of any demand, but simply that what the prosecution claimed to have done in the way of making the demand, he would not deny. But even if he had admitted fully that a *demand* had been made upon him it would not be competent and binding upon him. Whether or not a demand had been made was a question of law. A demand is something that has its legal constituents like a deed, and the existence of a valid deed could as well be proven by an admission, as a demand. Furay says Adams admitted the demand, to save the time and trouble and expense of bringing the postmaster of Omaha here. But if the postmaster were here what could he prove? Nothing that would show a demand and refusal. And this was no doubt the reason why Mr. Furay wanted to save the " time, trouble and expense " of bringing him to Deadwood. But in so important a matter as this to the defendant, the court must be thoroughly satisfied of the undoubted competency of such an admission before it will admit it against his objections. Admissions in criminal cases are not favored testimony, unless accompanied by unequivocal indicia of genuineness and full understanding on the part of the one making them.

The questions asked the defendant, had, among other things for their object, to show a want of guilty intent upon his part. He claimed that owing to the great influx of population to Deadwood and the Black Hills after his appointment as postmaster, and the rapid growth of the Postoffice Department in business and importance, that certain indispensable expenses had to be incurred, which he had reason to believe, from the officers of the Department at Washington, he would be allowed. These questions the Court would not allow, upon the ground that under the iron-clad laws of Congress, the question of intent cut no figure in the case. Our position is, that all criminal laws are based upon the maxim of the criminal law *actus non reus, nisi mens sit rea,* and that the guilty intent is necessary to constitute a crime. The indictment in this case is framed upon this rule and charges that the defendant " willfully, unlawfully and feloniously did embezzle the money of the United States." We undertook to meet this charge in the indictment, by these questions and this evidence, but were not

permitted to do so. We will treat more fully of the law on this point, when we take up the instruction bearing upon it, asked for defendant and refused by the court. We call the attention of the court to all this evidence, and insist that defendant's exceptions are well taken. Defendant offers to show that he had vouchers for more than the amount claimed by the Government against him; in other words, that he was not indebted to the Government, but that the Government is indebted to him, but he was not permitted to show this. This was simply a question of disputed accounts between the Government and the defendant, and he is not allowed the poor privilege, accorded by the law to the meanest litigant before every court of justice, of showing, that he does not owe the amount charged against him.

Boone Chambers was examined for the purpose of showing that when the defendant handed over the office to his successor Mr. Star, he delivered to the Government through him, and had his receipt, for a safe and other articles of personal property amounting to over $300, used by him in the office, for which he had paid his own money, and for which he had obtained no allowance, although the Government was in the actual possession and use of them. This was offered for the purpose of showing that the account of the Government against the defendant for $7,275.08 was incorrect, and ruled out. This testimony shows there was no settlement of accounts between the Government and Adams. This shows an error in the balance claimed by the Government. If an error in one instance, why may not the other errors claimed by Adams be shown, perhaps to the extent of liquidating the whole claim ? He claimed on the trial and offered to show that he owed the Government nothing, but that on a fair settlement the Government would be indebted to him. There is no escaping the conviction that the defendant has been found guilty on an incorrect account presented by the Government, and yet all evidence was ruled out by the court which was offered to show the non-indebtedness of the defendant to the Government. We submit that the exception is well taken.

D. P. Burnham was called as a witness to prove that a voucher settled by the Government in one of Adams' accounts, had never been paid by Adams. Burnham had been one of the clerks in the

postoffice, on some special duty, for which Adams was allowed a clerk. Burnham was engaged in the stationery business with Adams, which did not conflict with his duties in the office. Adams was constantly furnishing him money in the business, and there were unsettled accounts between them. Burnham gave him a voucher for his salary to be thereafter settled with him. The services were rendered by Burnham. He was entitled to his pay from the Government, and trusting to a future settlement with Adams he gave him this receipt. That settled the matter with the Government, and it then became a matter between Adams and Burnham, and it was no more a subject or matter of evidence in this case, than an unsettled account between the defendant and his grocer. Yet it was paraded before the jury as a great fraud. It was dwelt upon by the Court in his charge to the jury, and we are safe in holding that it had much to do in prejudicing improperly the minds of the jury and producing this unfortunate result. We submit that the testimony was wholly irrelevant and incompetent and should have been excluded, and that the exception is well taken.

The defendant asked the Court to instruct the jury, that " they must find from the evidence a willful and felonious intent by Richard O. Adams, to embezzle the public funds of the United States, and unless that is proven to the satisfaction of the jury the verdict should be not guilty." This is the charge in the indictment. This instruction was refused. It brings up the question of guilty intent before referred to. If intent is not a necessary element of crime, under the Acts of Congress, any employe of the Government, through whose hands Government funds may pass, is liable to disgrace and ruin for any merest mistake in his accounts. We maintain that every Statute, however *iron-clad*, which defines a crime, is based upon the common law, and is framed with reference to the question of criminal intent, unless it is excluded by its terms. Bishop on Criminal Law, 1st Vol, p. 345, holds that " in statutory offenses there must be an evil intent." It is to be so construed in connection with the common law, which requires such intent in every crime, as to add, in favor of a defendant, this provision. A good illustration of this common law doctrine is the interpretation given the English Statute 12, Gov. 3

c. 48, which made it felony to write any matter or thing, liable to stamp duty upon paper on which had previously been written some other matter so liable, before the paper had been again stamped, but made no mention whether the intent need be fraudulent or otherwise. Yet it was ruled by Abinger, C. B., "that the offense is not committed unless the intent is fraudulent." Bishop on Statutory Crimes, holds, page 352, "that the common law is not to be understood as having been displaced by a Statute, unless the Statute displacing it, is, in its express words or necessary effect, plain and unequivocal. Within this proposition is embraced the minor one, that where a Statute is drawn in general terms, no act within these terms is to be punished, unless it proceeded from what the common law regards, as a criminal mind." Ib. p. 363: "Indeed it is a general plan of our criminal legislation to define, or at least to forbid, particular acts, leaving the question of intent to be determined in each case by the rules of the common law." And again in determining how far the common law rules govern the Statutory Criminal Act, the same author says: "Still there is constant occasion to refer to the common law to ascertain the meaning of a Statute in respect of the act. For we have seen that if a Statute employs a word or phrase which has already been used in the common law, or in another Statute, and has there acquired by construction an established meaning, it is to be understood in the meaning previously determined. Thus there are no common law crimes against the United States, yet the Acts of Congress instead of minutely defining particular crimes often make it penal; for example, to commit *robbery*, or *larceny*, or *arson*, etc.; employing words of a well known common law meaning. In such a case the Court looks to the common law to ascertain the nature and limits of the offense, and a *robbery* under the Statutes differs in no respect from a robbery purely at the common law." Ib. p. 363–4; see §§ 6, 8, 99, 242, 269: "Indeed there is no place where the principles of the common law prevail, not even within the jurisdiction of the United States courts, or in States where they have no common law crimes, where statutory crime, pure and simple, and as an existence entirely separate from the common law, is known. The Statute may be the strong swimmer that boasts of being moved by no current, and of possessing all force in its own

arm.  Still, around it in all its extent and in all its parts, and constantly bearing it up, is the ever present ocean of the common law."  (Ib. § 364.)

Testing the Acts of Congress, under which the indictment in this case is found, we shall find that the common law criminal intent, is not excluded from their construction.  Take section 5495, which says, " that the refusal of any person, whether in or out of office, charged with the safe keeping, transfer or disbursement of the public money, to pay any draft  *  *  *  drawn upon him by the proper accounting officer  *  *  *  shall be deemed upon the trial of any indictment against such person for embezzlement, as *prima facie* evidence of such embezzlement."  Why *prima facie?* Only because such evidence may be rebutted or explained by any facts, showing that the claim was not due and owing, and that the amount of the draft was not correct; that the Government had property of the defendant in its possession and use that it had not allowed for; that, therefore, the $7,275.08, the amount of the draft in this case, is not correct and due ; that the defendant was not bound to pay an incorrect draft, and, therefore, there was no criminal intent of embezzlement, and the *prima facie* is removed. But we were not permitted to introduce any evidence, whatever, to meet this *prima facie* case, even if the proof of demand and refusal had been sufficient.  The Government has no more right to draw for more money than is due than an individual, and any law that would allow it to do so would be a nullity.  Any individual so drawn upon by an officer of the Government, has as much right to refuse the payment of the draft, as if drawn by another too exacting creditor.  The Government can make no laws by which it will force its employes to pay what they do not owe. If it can, then the Government, under the Act in question, can simply say that its employe owes it $5,000, when it does not owe but $500; draw on him for the $5,000, and if he refuse to pay the draft have him indicted for embezzlement and sent to the penitentiary.  We claim, then, that it is competent to show that the amount drawn for is not due, to rebut the *prima facie* case of criminal intent made by the refusal to pay the draft, and it was error in the Court not to instruct the jury as asked in the instruction under consideration.

Again, take section 5488: "Every disbursing officer who    *    *
*    *   converts to his own use in any way, whatever,   *    *    *    *
any portion of the public money   *    *    *    *   is in every such
act deemed guilty of embezzlement, etc., etc.   It is certainly com-
petent under this law to rebut any presumption of guilty intent
arising from an apparent conversion of public funds by any evi-
dence tending to remove or explain any such presumption.   All
the evidence offered by defendant for such purpose was rejected,
and the instruction allowing the jury to take any evidence in the
case into consideration for that purpose was refused.   Thus it will
be seen that all the sections under which the different counts of
the indictment were framed, are susceptible of explanation, and
are not subject to that iron rule which the court applied in this
case by excluding all evidence within the purview of the instruc-
tions refused.

The third instruction asked by the defendant was refused, and
is as follows:  "The jury are instructed that if the accounts be-
tween the Government of the United States and Richard O. Adams
are unsettled and not adjusted there is no criminal liability, and
the verdict should be not guilty."

The evidence of Boone Chambers, the Government's own wit-
ness, showed errors in the account of the Government against
Adams.   Chambers' and Stars' testimony showed the articles of
personal property unallowed to Adams, and, therefore, the accounts
between Adams and the Government were unadjusted and un-
settled, and in dispute, and he should not be held criminally
responsible under such circumstances.   All the evidence offered
and introduced by the defense shows and tends to show the dis-
puted and unsettled condition of these accounts, and we submit
that the jury should have been permitted to take these facts into
consideration for the purpose of determining the guilt of the
defendant.

The charge of the Court upon its own motion, in harmony with
its rulings throughout the trial, excluded and ignored all question
of intent on the part of the defendant, and towards its close the
Court say to the jury:  "If the Court commits an error in giving
you the law, there is a higher tribunal to correct it; but if the

jury commits an error, if it is a verdict of acquittal, it is remediless.      If the jury commit an error and it is a verdict of guilty, then the defendant has a remedy by appealing to this court." With all due deference to the learned Judge from whose lips this sentence fell, we cannot but think that this language, in a case fraught with such momentous consequences to the defendant, was unguarded and dangerous in the extreme.      Read the last sentence by itself.      Is it probable that if the jury commit an error in rendering a verdict of guilty, where there is no other error in the case, that there is a remedy by appealing to the Supreme Court? This is the meaning of that sentence.      It excludes the idea of all error on the part of the court, and in effect instructs the jury that even though there be no error committed in the case, except that of a verdict of guilty by the jury, that verdict may be corrected by appeal to a higher tribunal.      That this sentence may have sealed the fate of the defendant we have serious apprehensions.      It may have silenced all question of reasonable doubt in their minds.      It may have released them of all fear and anxiety of doing a wrong by a hasty verdict of guilty.      Indeed it may have raised from their shoulders and their consciences all responsibility of an erroneous verdict and caused them to be lulled into an unconscious indifference and security over the ruin they were making of a fellow man, under the belief that their error, if any, would be *easily* corrected.      It is unnecessary to enter into a discussion as to the power of a Supreme Court over the verdict of a jury in a criminal case, where they are made peculiarly the judges of the facts.      Such a discussion would be fruitless before a court understanding its own powers.      We leave the question to the court and invite its serious consideration of it.

*Hugh J. Campbell*, for defendant in error.

The indictment in this case was drawn under the provisions of sections 5488, 5490 and 4053 of the Revised Statutes, and chapter 144, page 479 of volume 18, Statutes at Large.

The indictment contains six counts.      The first count charges the defendant with embezzlement of $7,275.08, under the provisions of section 4053 of the Revised States.      The second count charges

the defendant with embezzlement of same sum under the provision of section 5488. And the third count charges the defendant with embezzlement of same sum under the provision of section 5490 of Revised Statutes. And the fourth count is a general count of embezzlement. The fifth count charges the defendant with embezzling and purloining same sum under the provisions of chapter 144, above named. And the sixth count charges defendant with purloining $7,275.08, under the provisions of chapter 144, Vol. 18 S. L.

The provisions of law governing postmasters and the Treasury Department in the rendition and settlement of postoffice accounts in addition to those already quoted are as follows: Section 161, Revised Statutes; Section 270, Revised Statutes; Section 277, Revised Statutes; Section 407, Revised Statutes; Section 887 of the Revised Statutes; Section 889 of the Revised Statutes; Section 890 of the Revised Statutes; Section 3622 of the Revised Statutes; Section 3857 of the Revised Statutes to 3858 inclusive; Section 3860 of the Revised Statutes; Section 3861 of the Revised Statutes; Section 3862 of the Revised Statutes; Section 3846 of the Revised Statutes; Section 5496 of the Revised Statutes; Section 5494 of the Revised Statutes; Section 5495 of the Revised Statutes and the Acts contained in Statutes at Large, volume 18, page 233, volume 19, page 81, and volume 20, page 361.

By these provisions of law it will be seen that a postmaster is bound to pay over to the treasury of the United States all moneys coming to his hands from the postal revenue, except such as he is by law expressly allowed to retain.

A postmaster, in charge of a postoffice of the second-class, was, by law, allowed $2,800 for salary at the time covered by this indictment. This he was allowed, by law, to deduct from public moneys received by him. In addition to this the law allowed the Postmaster General to authorize a certain amount to be retained by the postmaster quarterly for annual expenses. In this case this order, authorized by law, was made, and the defendant was authorized to retain the annual sum of $3,300 for expenses.

These two items, and these alone, to-wit, the sum allowed him by law for salary, and the sum he was authorized by the Post-

master General, under the law, to retain for the expenses of the office, were the sole and only sums which the defendant was authorized to keep back or retain in his possession out of the postal revenues.

The substance of the charge in the indictment contained in all the counts, was that over and above these amounts, which he was authorized by law to retain, the defendant had retained and refused to pay over and converted to his own use and used, and applied for purposes not prescribed by law, and had willfully neglected to deposit in the treasury of the United States the sum of $7.275.08. These acts constitute embezzlement under the Statutes.

The evidence adduced by the Government was as follows: The transcript of the balance of account due from defendant to the government from the books of the Treasury Department, certified under the hand and seal of the sixth auditor of the treasury. A certified copy of the order of the Postoffice Department, rating the office, and certified copy of the official bond of the postmaster. Proof was also offered and admitted of the demand on the part of the Government for the payment of the balance. Proof was also offered and admitted that the defendant was postmaster in charge of the postoffice at Deadwood at the time and place charged. The original quarterly returns of the defendant were also in evidence and sworn to by the defendant, showing the receipt of the money in question by the defendant.

For the defense there was no denial of the accuracy of the accounts so far as they showed the receipt of the money in question by the defendant. There was no clerical error alleged, no mistake, no fraud averred, in the accounts.

The only defense alleged was that sundry expenditures were made by the defendant over and above the amount allowed by law, for which he should have received credit as he alleged, but did not; and to support this defense defendant offered sundry receipts purporting to show the alleged expenditure of certain sums of money for expenses of the postoffice over and above the expenses allowed by law. These offers were overruled. The acts of Congress just quoted show too clearly for argument that there was no error in those rulings.

The only other error urged in the motion of defendant for a new trial, besides the alleged errors just noted, are the following :

1st.   The denial of defendant's motion that another judge be called in to preside at said trial.

2nd.   The refusal of the Court to grant the instructions 1, 2, 3, and 4, asked by the defendant.

3d.   That part of the charge of the Court to the jury contained in the following words:

"If the Court committed an error in giving you the law, there is a higher tribunal to correct it; but if the jury commits an error, if it is a verdict of acquittal, it is remediless.   If the jury commit an error and it is a verdict of guilty, then the defendant has a remedy by appealing to this court."

As to the first alleged error, it may be sufficient to state that the defendant did not present in support of his motion any Statute of the United States, nor any authority whatever.   The motion was grounded solely upon a provision of the Territorial Code, which by its terms refers solely and exclusively to criminal offenses against the laws of the Territory, prosecuted on the Territorial side of the court by Territorial officers.   Besides the fact that this chapter of the Code by its terms is expressly confined to such cases, and does not purport to apply to causes where offenses against the United States are prosecuted on the federal side of the court, there was another and more powerful objection to defendant's motion, which is this, that the motion involved a question of jurisdiction.   It asked the Court by a judicial order to transfer a jurisdiction conferred upon it in express terms by the law of the United States, from the judge of that court to the judge of another court.   It asked the judge of his own motion to abdicate the jurisdiction imposed upon him by Congress, and to attempt to confer the jurisdiction and impose the duty upon another.   The same question was discussed upon a similar motion before His Honor Judge Shannon in the Second District Court, but the motion was denied in an opinion which we cite in which the authorities quoted sustain the opinion of that judge.

As to the error alleged, in the refusal of the instructions asked

by defendant, we say that an inspection of the Statutes under which the indictment is drawn, is sufficient to show that the first instruction asked for by defendant was plainly error, and its refusal was not error.

The second instruction asked for by the defendant, the refusal of which they assign as error, was wholly inapplicable to the case, and if granted would have misled the jury.

The evidence adduced by the government was a certified copy of an account that had been settled and adjusted.

The third instruction asked for by defendant, the refusal of which is assigned as error, is plainly opposed to the express provisions of the Statutes cited.

The fourth instruction asked for by defendant, the refusal of which is assigned as error, is endorsed in the record as given in substance in the general charge, not otherwise.

These assignments of errors, which we have noticed, are all which appear to us to have been taken and saved in the record. It seems hardly necessary to cite authorities in so plain a case. There really was no defense whatever made by the defendant to the charges in the indictment; nor under the facts admitted was there any defense possible.

The Supreme Court of the United States have construed the law bearing upon the responsibility of disbursing officers and other public officers of the United States, charged with the safe-keeping of public moneys in 11th Wallace, 650; 4th Wallace, 648; 13th Howard, 603; 9th Howard, 248; 9th Wheaton, 651; 3rd Peters, 12; 10th Howard, 109; 8th Peters, 375 and 378; 9th Wallace, 759; 13th Wallace, 17; 13th Wallace, 56; 13th Wallace, 63, which we herewith cite.

We have only space to notice one of the points made.

It is that in which plaintiff in error assigns as error part of the charge of the Court.

Counsel charge that this was error, because "it may have silenced all questions of reasonable doubt in their (the jury's) minds."

The answer to this is:

1st. That take the charge as a whole, and the express instruc-

tion of the Court on reasonable doubt, and it is plain that the language meant no such thing; and also that it was impossible for the jury, hearing the whole charge, to take any such meaning from it. To suppose them to have done so, we would be compelled to presume that they had ignored, entirely, the instructions of the Court on the subject of reasonable doubt.

2d. The evidence in the case undenied and admitted by defendant, left no place for reasonable doubt. It was undenied that Adams was postmaster as charged. That he had received the money as charged. That he had been allowed all the salary and expenses to which he was lawfully entitled. That after deducting these from the money received, there was a balance of $7,275.08, money of the United States in his hands, which he now holds, or has used contrary to law.

As to these facts there was no room for reasonable doubt.

The defense set up was that he had used and applied this money for purposes other than those allowed by law.

This, as the Court says, if proven, was no defense, but was, in itself, embezzlement. The Court overruled this evidence.

The only doubt attempted to be raised now by his counsel is whether this ruling of the Court was correct. Whether the fact that he alleged that he had spent the money for the government ought not to have gone to the jury. If there is any doubt on this point, it is a question of law—one for the court and not for the jury—and, therefore, one as to which the doctrine of reasonable doubt has no application.


Moody, J.—The plaintiff in error was postmaster at Deadwood, Dakota Territory, from about April, 1877, until the 26th day of June, 1879. At the August 1880 term of the District Court for the First Judicial District of said Territory, he was indicted for embezzlement of postoffice funds, belonging to the United States, received by him as such postmaster, was tried and convicted, and now brings the cause to this court by writ of error.

The errors alleged are:

*First.* That the District Judge refused, upon defendant filing his affidavit of prejudice, to call another judge to preside at the trial.

*Second.* In receiving and rejecting certain evidence.

*Third.* In refusing to instruct the jury, as requested by defendant.

*Fourth.* In certain portions of the instructions, as given.

I. Before the trial, the defendant filed his affidavit, alleging prejudice in the judge, using the language employed in the Code of Criminal Procedure of the Territory, and thereupon, moved the court to call another judge to preside at the trial. This the court refused to do, upon the ground among others, that no power existed to make such an order.

The indictment was pending in the court held for the whole district. In this cause, the court was exercising the jurisdiction which appertains to the District and Circuit Courts of the United States, under the laws of Congress. The indictment was for an offense against the United States. No law of Congress authorized the judge to thus abdicate his duties, and by an order to that effect, impose the duty of presiding at the trial, upon another judge. The practice act of the Territory, does not in this particular, apply to the court, while exercising the character of jurisdiction indicated, but is by its clear meaning, confined to cases arising under the laws of the Territory, the proceedings in which are being conducted in the courts for the county or sub-division. The power to make such order, is not found in the general provision of the practice act, recognizing and continuing in force the practice in vogue in the courts, sitting for the district as it is termed "upon the United States or Federal side of the court." No such practice has ever been recognized in this Territory. On the contrary, the judges of both of the other courts exercising similar jurisdiction, have, in their courts, refused to make such an order, and for the same reason. The order would have had no binding force upon either of the other judges. The effect of it would have been, simply, to postpone indefinitely the trial of the defendant, and such may have been his purpose. No other

judge could have reached the place of trial without traveling, going and returning, a distance of from fifteen hundred to two thousand miles, a large portion of the way without railroad communication. However disinclined a judge may be to preside in the trial of a person, after he has made such an affidavit, natural as the disinclination is, though the judge is conscious of no prejudice, and believe it made merely to obtain delay, the wishes of a judge cannot be allowed to influence him in the discharge of his plain duty.

No power exists in the District Courts, in cases where indictments for offenses against the United States are pending, to make an order changing the judge, or calling another judge to preside at the trial, because of the filing of an affidavit of prejudice against the judge regularly assigned to the district. Nor does it by reason of such order, if made, become the duty of such called judge to so preside.

There is nothing however, which precludes a judge at his convenience, from presiding in such cases, in a district other than that to which he is by law assigned, in the absence, or in case of the disability of the judge of the district.

As a question of power, it was the plain duty of the court to refuse the order applied for.

It is but just to counsel to say, that they courteously disclaimed entertaining any views similar to those expressed in the affidavit and only urge the point in this court for the commendable purpose of endeavoring to save their client from the effects of his conviction, and upon the ground, that the *power* to make the order was denied by the District Court, and not because the defendant was in any wise, in fact, prejudiced by the refusal to make it.

II. The evidence objected to, consisted of certain documents from the office of the Auditor of the Treasury for the Postoffice Department—the sixth auditor. Both the originals and certified copies, duly authenticated, were offered. The originals being produced and exhibited by an officer of that department, who was a witness, and who was properly in charge of the papers, and the copies being also offered, in order, if desired, they might go into the record, it being improper to take from the custody of the witness, the originals.

The documentary evidence in question, consisted of the defendant's quarterly returns as postmaster, the accompanying vouchers, the settlement by the Auditor of the Treasury for the Post-office Department, the statement of the account of the defendant from the books and proceedings of the Treasury, and an order appointing a person to make demand for the balance due the United States, and his return thereon endorsed.

With the exception of the last named paper, to-wit: the order and return thereon, no particular stress is laid upon the objection to the introduction of this evidence, by counsel in this court, and it might suffice to say, that each of these documents thus received, were properly proven and authenticated, and are made by the laws of Congress, competent evidence.

The object and purpose of the evidence was to show the balance against the defendant upon the adjustment of his accounts, as postmaster, by the proper accounting officer of the Treasury Department. The defendant was indicted for the embezzlement of $7,275.08, the balance remaining in his hands after an adjustment and settlement of his accounts, for moneys collected and received by him, as such postmaster, between January 1st, 1879, and June 26th, 1879, at which last named date he went out of office. Among the documents thus received, against his objection, were the defendant's own original reports, or accounts current, duly and legally signed and verified, in which he admits a balance in his hands, at the date of his going out of office, of nearly the amount charged as embezzled, which, with some small vouchers, charged in his account but disallowed, as unauthorized, constitutes the amount of $7,275.08.

In the face of that sworn account by the defendant himself, thus showing an admitted balance, and in the absence of any showing whatever of any subsequent payment or settlement, any error, if any was committed, in admitting the other documents, was error without prejudice. But none appears.

Section 889, Rev. Stat., U. S., provides: "Copies of the quarterly returns of postmasters, and of any papers pertaining to the accounts in the office of the sixth auditor, when certified   *   * shall be admitted as evidence in the courts of the United States in

civil and criminal prosecutions, and in any civil suit in case of delinquency of any postmaster   *   *   *   a statement of the account, certified as aforesaid, shall be admitted as evidence * * ''

Section 5494, same Statute, provides: "Upon the trial of any indictment against any person for embezzling public money under the provisions of the six preceding sections, it shall be sufficient evidence for the purpose of showing a balance against such person, to produce a transcript from the books and proceedings of the treasury, as required in civil cases.   *   * ''

The defendant was indicted under more than one of the "six preceding sections" there spoken of. These Statutes are conclusive against the objections thus made by the defendant, to this documentary evidence.

The objection the most urgently pressed in the brief of counsel for plaintiff in error, is to the introduction of evidence of demand. The documentary evidence relating thereto, consists of the order of the department, designating and appointing Thos. F. Hall, postmaster of Omaha, as the agent of the government to make the demand, the return thereto of such agent, under the provisions of section 890, U. S., Rev. Stat., and the draft accompanying such order. In connection with such documentary evidence, the prosecution adduced evidence of the oral admissions of the defendant, that such demand had been made by such designated agent.

The order designating the Postmaster Hall, as the authorized person to make the demand, was clearly competent. The law authorizes such appointment, and to establish a legal demand, one of the essential requisites is to show that the party making it was thereunto duly authorized. This order directly tended to prove the authority of the Agent Hall. As the objection was to the order and the return, and was not to the return alone, it was properly overruled, without regard to the question whether the return thereon was competent evidence, in a criminal prosecution, or is by the terms of the Statutes, confined, as to competency, to civil suits, a question which it is not necessary now to determine.

Again; the order and the draft were proper links in the chain of evidence, in connection with the testimony of the witness Furay, of the admissions by the defendant, that such demand had been

made by the Agent Hall, to explain the testimony, and show, to what such admissions applied. Moreover, it further conclusively appears in the transcript, by competent proof, that long prior to the finding of the indictment, the defendant had made away with, without authority of law, all the moneys which he was charged with embezzling, had no portion of it left, had paid over to the government no part of it, nor had he deposited it, as required by law. Therefore demand being ineffectual, was unnecessary, to fix his criminal liability. Demand and refusal is only *prima facie* evidence of embezzlement under the Statute, and is not necessary to conviction, to the extent of excluding other proof.

The evidence, excluded by the District Court in the ruling complained of, consisted of certain receipts for moneys, which defendant alleged he had paid for expenses of the Deadwood postoffice, while postmaster, and also of statements of the defendant as a witness, to the effect, that his accounts were still unsettled and unadjusted, because these receipts, to the accounting officer of the government, had been disallowed, as unauthorized expenditures, but were still insisted upon by him.

In order to a correct understanding of the question arising upon this alleged error, it is necessary to give some of the facts appearing in the transcript, and examine the laws of Congress relating to the duties, powers and responsibilities of United States postmasters, of the grade to which the defendant belonged. It appears that during the time when the moneys covered by this indictment were received, to-wit: from January 1st to June 26th, 1879, the postoffice at Deadwood was, under the law, rated as a second-class office. The salary then attached to an office of that class, was less than $3,000 and not less than $2,000 per annum, to be fixed between those sums, by the Postmaster General in his discretion, in even hundred dollars. The sum fixed by the Postmaster General to be allowed the defendant, was the highest amount allowed by law, to-wit: $2,800 per year. By the provisions of section 3860, U. S. Rev. Stat., "the Postmaster General may allow to  *  *  * postmasters at offices of the  *  * second-class, out of the surplus revenues of their offices  *  *  * over and above the salary assigned to the office, a reasonable sum, for the necessary cost of

rent, fuel, lights, furniture, stationary, printing, clerks, and neces-
sary incidentals, to be adjusted on a satisfactory exhibit of the
facts, and no such allowance shall be made except upon the order
of the Postmaster General." Under this provision, the defendant
had been allowed to expend, for those purposes, the sum of $3,300
per annum, or a proportionate amount for each quarter, and the
order of the Postmaster General making the allowance, and fixing
the sums for each purpose, had been communicated to the defend-
ant long prior to the receipt of the funds, for the embezzlement
of which he was convicted. It was under this allowance, thus
made by the Postmaster General pursuant to the provisions of the
Statute, that the defendant was authorized to make the expen-
diture of any of the public funds which came to his hands.
In the adjustment of his accounts, the defendant had been credited
with the full proportionate amount of this allowance, and of his
salary, and the balance of $7,275.08 was found due the govern-
ment. Such were the facts by the defendant's own showing.
The receipts or vouchers offered by him were in excess of this
allowance, in part, and a portion were for moneys claimed to
have been expended by him prior to the 1st of January, 1879,
including a time before the rating of his office, when the law
absolutely prohibited any expenditure, at the expense of the
government, beyond what had been allowed him in the adjust-
ment of his former accounts. They had all been presented to
the Auditor of the Treasury for the Postoffice Department, had
been properly and legally rejected, and disallowed, as not been
authorized by law, and no appeal had been taken to the comp-
troller from such disallowance. The defendant had been al-
lowed, and he had deducted from the receipts of his office, all
that was authorized by law, and the orders of the Postmaster
General, made, in pursuance of law. There was a balance due the
government from the defendant, received by him as such post-
master, during a period prior and up to the 1st day of January,
1879, of nearly $3,800, for which another indictment was pending,
making in all about $11,000. The admission of these rejected
vouchers, could have served no useful purpose in his favor. They
would have constituted no defense to the indictment. Neither the
Court, nor the jury, had any authority to declare these additional

alleged expenditures, either reasonable, or necessary. A branch of the Executive Department of the government, was entrusted by law with the determination of the propriety, or necessity, of such expenditures. In the exercise of a discretion, in discharging the duties imposed upon him by law, the Postmaster General had acted in the matter, had legally exercised such discretion, and discharged those duties. His action was in no wise revisable by the Court, or by the jury. To have admitted these receipts in evidence, would have been to submit to the jury for determination the question, whether such alleged expenditures were reasonable or necessary, a question which by law is to be determined by the Postmaster General, and by him only. Section 3846, Rev. Stat., U. S., provides as follows: "Postmasters shall keep safely, without loaning, using, depositing in an unauthorized bank, or exchanging for other funds, all public moneys collected by them, or which may come into their possession, until it is ordered by the Postmaster General to be transferred or paid out." Section 3861, same Statute, is as follows: "The salary of a postmaster and such other expenses of the postal service, authorized by law, as may be incurred by him, and for which appropriations have been made, may be deducted out of the receipts of his office, under the direction of the Postmaster General."

Under the direction of the Postmaster General, the salary at the rate of $2,800 per year, and the allowances at the rate of $3,300 per year for the expenses of his office, had been deducted out of the receipts of the defendant's office. Further deduction was, by law, without the direction of the Postmaster General, (section 3862, U. S., Rev. Stat.,) wholly invalid and unauthorized, and could not have legally been made by any accounting officer of the government, certainly not by the Court or jury.

Such receipts, or vouchers, together with the statement of the defendant, that by reason of their rejection his accounts were still unsettled, were properly excluded. The only effect of the introduction of such receipts would have been to prove that the defendant was guilty as charged, by thus unlawfully using and expending the public moneys of the United States, and they might thus have been useful to the prosecution, but the prosecution is not complaining, and the defendant cannot complain at the exclusion of evidence, the only effect of which would be to

establish his guilt, unless possibly to mislead the jury. The introduction of this evidence cannot rightfully be claimed upon the ground that it had or might have had some bearing upon the question of intent, for he was presumed to know the law. He was bound to know that by law such expenditures out of the public moneys in his hands, were unauthorized, and the act itself was criminal, and made him guilty of embezzlement under the Statute. The question of intent will be further considered in connection with another assignment of error.

III. The instructions asked by defendant, and refused by the court, are as follows:

1st. " The jury are instructed that if the accounts between the government of the United States and Richard O. Adams are unsettled, and not adjusted, there is no criminal liability, and the verdict should be not guilty."

2d. " They must find from the evidence, a willful and felonious intent by Richard O. Adams to embezzle the public funds of the United States, and unless that is proven to the satisfaction of the jury, the verdict should be not guilty."

To the first of the above requests, much that has been said relating to the rejection of the offered evidence, will pertinently apply. This instruction would, under the facts in this case, have been equivalent to telling the jury that because the defendant had presented vouchers which had been disallowed by the proper accounting officers of the Treasury, as being for expenditures not authorized by law, and he afterwards persisted, and still persists in his claim to have them allowed for these reasons, and these only, he could with perfect impunity, convert to his own use make away with, and unlawfully expend, all the public moneys in his hands, and is subject to no criminal liability therefor. The absurdity of the proposition is apparent in its mere statement. A public officer cannot escape responsibility for the unlawful use or expenditure of the public moneys entrusted to him, merely because he asserts, either in good or bad faith, that their expenditure was necessary or proper. To establish such a rule would tend to subvert the government by putting it out of its power to enforce the laws relating to the collection and protection of the

public funds. When a public officer takes upon himself the duties of his office, he assumes the responsibilities attached thereto; and it is at his peril that he pays out or uses any of the public funds. The criminal laws of Congress so hedge about a postmaster of the United States in his disposition of the postoffice funds belonging to the United States, that he cannot escape conviction by pretending to have done, or even having done, what he regarded was for the convenience of the patrons of his office, or the best interests of the government, in making away with the public funds. A tribunal is delegated by law to determine, within the limits prescribed by law, questions of that character. It is not permitted to the thousands of postmasters throughout the country, to pay out, in their discretion, the public funds collected by them.

This request was properly refused. The second request would no doubt be proper in a case of embezzlement of private property, or where the law was such as to admit of any discretion in the disposal of public funds. But no such discretion existed in this case. It was insisted below, and is insisted here, in counsel's brief, that this instruction should be applied to all the counts in the indictment, and it was so asked. The indictment contains six counts. The first count charges the defendant with embezzlement under the provisions of section 4053 of the U. S. Revised Statutes. The second count charges the defendant with embezzlement under the provisions of section 5488. The third count charges the defendant with embezzlement under the provisions of section 5490. These sections, make the commission of the act, in the one case, and the omission to perform the duty, in the other, the crime.

A criminal intent, is generally, an essential ingredient in the commission of a crime, and proof of such intent, to the satisfaction of the jury, is necessary to a conviction. But where, as under these sections, the act or omission, is of itself made to constitute the criminal offense, knowingly and willfully doing the act, or omitting to perform the duty imposed by the law, carries with it a conclusive inference of criminal intent, and no other evidence of such intent is necessary. "Every man is presumed to intend

the necessary and legitimate consequences of what he knowingly does." Here the defendant knew that he had expended the money for his own purposes, or in a way not authorized by the Postmaster General. He knew that thus using it was forbidden by law, and made him guilty of embezzlement. He knew that he had failed to deposit the public moneys in his hands in the proper depository. He also knew that he was required to do so by law. When, therefore, he used the money without authority in the one case, and omitted to make the deposit in the other, he is presumed to have intended to break the law. "And the breaking of the law is the crime. Every act necessary to constitute the crime was knowingly done, and the crime was therefore knowingly committed. Ignorance of a fact may sometimes be taken as evidence of a want of criminal intent, but not ignorance of the law." (*Reynolds v. the United States*, 8 Otto, 167.)

One patent fact the defendant knew—if he had paid this money for the expenses of his office, as is the theory of the defense—and that was: that he had paid at least a portion of such alleged expenses out of the moneys received from the sale of postage stamps, and stamped envelopes, etc., and if it was all thus paid out, that a large portion of such expenses were paid out of such receipts; and he also knew, that the law absolutely forbid the payment of such expenses out of funds received from such sources, and confined the expenditure to be taken from " the surplus revenues of his office—that is to say, the excess of box rents and commissions over and above the salary assigned to the office." (Section 3860, U. S. Rev. Stat.)

We are not called upon to pronounce upon the good faith of these offers, but it is worthy of remark, if it is claimed that the whole of this balance of $7,275.08 was paid out for expenses, besides the $1,640 allowed, that it seems quite an extraordinary amount to be expended for a second-class office, in a population of the number tributary to the office in question, in a little less than six months. If the whole sum was not expended then it was immaterial whether any was paid out, only so far as to fix a guide to the Judge upon conviction in determining the amount of fine to be imposed ; for the embezzlement of any amount would

authorize, and require, a verdict of guilty, as well as if the whole sum named in the indictment had been embezzled.

Under the case as presented to the jury, it was not error to refuse the instruction requested by defendant.  Its only office would have been to mislead the jury, and induce them to suppose that it was essential to a conviction, for the prosecution to establish, by some extrinsic evidence, a criminal intent, beyond what was to be inferred from proof of the commission of the crime.

IV.   That portion of the charge as given which is complained of, consists of the following language:  " If the Court commits an error in giving you the law, there is a higher tribunal to correct it; but if the jury commits an error, if it is a verdict of acquittal, it is remediless.    If the jury commit an error, and it is a verdict of guilty, the defendant has a remedy by appealing to the court." If this language stood alone upon the subject, or if the case was one admitting of any doubt by a jury, although what is there said is strictly true, this court, certainly, could not have commended the use of it, but rather would be inclined to condemn it, as at least useless, if not harmful.    But we are not at liberty to select a single sentence of the charge, isolate it from all other portions of the instructions, disconnect it from the case before the jury, and give such isolated sentence a construction standing alone.   We must consider it with the context, and guided by the light which the case upon trial throws upon it.    The jury had before been told, and they were afterwards reminded with clearness and emphasis, that they were the exclusive judges of all the facts, and were alone responsible for their finding upon the facts.   That the duty of the Judge was completely fulfilled by instructing them upon the law, and that they were not to find the defendant guilty, unless they were satisfied from the evidence, of his guilt, beyond any reasonable doubt, and what constituted reasonable doubt, was correctly explained to them.    Again, the case before the jury was substantially this, not only by the undisputed evidence of the prosecution, but as well by the admissions of the defendant, under oath, before them, from the witness stand:   The defendant had received as postmaster, public moneys to a large amount out of which he had been allowed to retain, and had deducted, all the salary, emolu-

ments, and expenses, which were allowed him under the law; that there still remained in his hands, over all these, about $11,000, of which $7,275.08 were included in the indictment before them; that he had failed to safely keep this amount, or to pay it over, or to deposit it, as required by law, or any portion of it, but had paid it all out, had used it, without authority of law, and had converted it to his own use; the only defense pretended, being, that a portion of the amount had been paid for unauthorized expenses of his office, itself constituting embezzlement.    Under these circumstances, and following the case decided in this court—*Territory v. Gay*, May term, 1879—the District Judge would have been justified in saying to the jury, that if they believed the undisputed evidence in the case, including that of the defendant himself, it was their duty to pronounce, at least upon three of the counts, a verdict of guilty.    This being the case before the jury, and these being the conceded facts, the guilt of the defendant was beyond all doubt, and the defendant could not have been unjustly prejudiced by the language complained of in the instructions.

There being no error apparent in the record, the judgment of the District Court is

AFFIRMED.

All of the Justices concurring.